IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BLUE SKY INNOVATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 23-129 (MN) |
| | ) | |
| FORCOME CO., LTD. and FORCOME (SHANGHAI) CO., LTD., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Kevin M. Capuzzi, Kristen Healey Cramer, Noelle B. Torrice, BENESCH FRIEDLANDER COPLAN & ARONOFF LLP, Wilmington, DE; Eric Larson Zalud, Michael S. Weinstein, Deana S. Stein, Alayna Bridgett, BENESCH FRIEDLANDER COPLAN & ARONOFF LLP, Cleveland, OH – Attorneys for Plaintiff

David E. Moore, Bindu A. Palapura, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Todd R. Tucker, Yizhou Liu, Ronald M. McMillan, Meredith K. Collier, Kyle T. Deighan, Dustin D. Likens, Xin Wen, Xu Jin, CALFEE, HALTER & GRISWOLD LLP, Cleveland, OH – Attorneys for Defendants

September 30, 2026
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

Beginning on August 11, 2025, the Court presided over a five-day jury trial in this breach of contract, tortious interference, and trade secret misappropriation action between Plaintiff Blue Sky Innovation Group, Inc. ("Blue Sky" or "Plaintiff") and Defendants Forcome (Shanghai) Co., Ltd. ("Forcome Shanghai") and Forcome Co., Ltd. ("Forcome Hong Kong") (together, "Defendants"). (*See* D.I. 272, 273, 274, 275, 276 (together, "Tr.")). On August 18, 2025, the jury returned a split verdict on the parties' respective claims and counterclaims. (D.I. 254). Presently before the Court are the parties' post-trial motions. (D.I. 268, 269, 280, 281). For the following reasons, the Court will GRANT-IN-PART and DENY-IN-PART Plaintiff's motions and will GRANT-IN-PART and DENY-IN-PART Defendants' motions.

## I. <u>BACKGROUND</u>

Blue Sky is an Ohio corporation that develops consumer products, including meat grinders. (D.I. 244 ¶¶ 12-13). Forcome Shanghai and Forcome Hong Kong are corporations organized under the laws of the People's Republic of China ("China"). (*Id.* ¶¶ 14-15). Nonparty Forcome (Qingdao) Co., Ltd. ("Forcome Qingdao") is also a Chinese corporation, and Forcome Shanghai, Forcome Hong Kong, and Forcome Qingdao are part of a collective referred to as the "Forcome Group." (*Id.* ¶¶ 16-17).

On September 2, 2014, Blue Sky and Forcome Shanghai entered into an agreement for the development, manufacture, and sale of a line of electric meat grinders ("the Cooperation Agreement"). (D.I. 244 ¶¶ 18-19). The Cooperation Agreement contemplated that Forcome Shanghai would manufacture grinders to be purchased by Blue Sky and Cabela's Inc.,[1] an outdoor recreation retailer. (*Id.* ¶¶ 20, 28). Section 2 of the Cooperation Agreement addressed exclusivity

[1] Cabela's, Inc. was later acquired by Bass Pro Shops. (D.I. 244 ¶ 27). For ease, this opinion will refer to the Cabela's, Inc./Bass Pro Shops entity as "the Retailer."

("the Exclusivity Provision"), and Section 7 addressed confidentiality ("the Confidentiality Provision"). (*Id.* ¶¶ 20, 23). Under the Exclusivity Provision, Forcome Shanghai served as the sole manufacturer of certain defined "Exclusive Products," including certain "E-Grinder[s]" described as having a "Cooling System (Bluesky patent pending) designed by Bluesky." (*Id.* ¶¶ 20-21). The Exclusivity Provision further provided that Forcome Shanghai would not "manufacture, sell, or distribute" the Exclusive Products or "similar exclusive products" to any entity other than Blue Sky or the Retailer. (*Id.* ¶ 20). The Confidentiality Provision addressed confidential and proprietary information exchanged "[i]n connection with the business between" Blue Sky, Forcome Shanghai, and the Retailer, including information regarding "products, [c]ustomers, marketing data, [and] methods," and it provided that such information was to be used only in connection with the parties' business relationship. (*Id.* ¶ 23). Under the Confidentiality Provision, disclosure of any confidential information required the prior written consent of the parties. (*Id.*).

During the term of the Cooperation Agreement, Blue Sky and Forcome Shanghai exchanged correspondence, drawings, and manufacturing information in connection with the development and manufacture of the Exclusive Products. (D.I. 244 ¶ 24). Under the Cooperation Agreement, Blue Sky was to pay for the initial tooling required to manufacture the grinders, and Forcome Shanghai was to reimburse $150,000 of Blue Sky's tooling investment through rebates on grinder purchases, after which Forcome Shanghai would own the tooling. (*Id.* ¶¶ 31-32). The resulting grinders ("the Blue Sky-Forcome Grinders") were launched under the "Carnivore" brand name in Fall 2015. (*Id.* ¶ 25). Blue Sky ultimately facilitated the supply of the Blue Sky-Forcome Grinders and their accessories, including a removable cooling jacket marketed under the trademark Cool-Tek®, to the Retailer for public sale. (*Id.* ¶¶ 26-27, 30).

Blue Sky obtained several utility and design patents relating to the Blue Sky-Forcome Grinders and their accessories in the United States. (D.I. 244 ¶ 29). Between 2015 and 2017, nonparty Forcome Qingdao also obtained several patents relating to the Blue Sky-Forcome Grinders from the China National Intellectual Property Administration. (*Id.* ¶ 33). Those patents included utility model and design patents for the Blue Sky-Forcome Grinders, a utility model patent for the Cool-Tek® cooling jacket, and two utility model patents for a Blue Sky-Forcome Grinder safety cover (collectively, "the Chinese Patents"). (*Id.*). Blue Sky was aware of the Chinese Patents no later than April 5, 2018. (*Id.* ¶ 34).

On October 4, 2018, while the Cooperation Agreement remained in effect, Blue Sky entered into a Tooling and Manufacturing Agreement with nonparty Yuchi Metal Products Factory ("Yuchi"), under which Yuchi agreed to manufacture another line of Carnivore electric meat grinders ("the Blue Sky-Yuchi Grinders"), which incorporated a new version of the Cool-Tek® cooling jacket, for shipment to the Retailer. (D.I. 244 ¶¶ 35-36). Blue Sky sent its first purchase order for Blue Sky-Yuchi Grinders on February 28, 2020. (*Id.* ¶ 37). On July 2, 2020, Blue Sky informed Forcome Shanghai in writing that it would no longer place orders for Blue Sky-Forcome Grinders. (*Id.* ¶ 38). On July 7, 2020, Laura Lee, Forcome Shanghai's Vice President of Sales and Operations, copied representatives of the Retailer on an email to Blue Sky. (Tr. 222:2-223:22, 351:17-24, 606:10-16). The email attached a product development history document of the Cool-Tek® device and a price list. (Tr. 224:8-21, 225:3-226:1). On August 28, 2020, Yuchi delivered its first order of Blue Sky-Yuchi Grinders to Chinese Customs for shipment to the Retailer. (*Id.* ¶ 41). On or about October 30, 2020, Blue Sky was notified that a Yuchi shipment could not be exported because Chinese Customs had seized the shipping container following Forcome Qingdao's assertion of its Chinese Patent rights against Yuchi. (*Id.* ¶ 42; *see also* D.I. 270 at 5-6).

Chinese Customs released the container on December 31, 2020, and it arrived at the Retailer approximately four months later. (D.I. 244 ¶ 44).

The Cooperation Agreement between Blue Sky and Forcome Shanghai terminated no later than January 2, 2021. (D.I. 244 ¶ 40). Thereafter, Forcome Shanghai began pursuing other electric meat grinder customers, including American Outdoor Brands, Inc. ("AOB") and The Sausage Maker, Inc. ("TSM"). Defendants began manufacturing and selling grinders to AOB in 2021 ("the AOB Grinders") and to TSM in 2022 ("the TSM Grinders"). (*Id.* ¶¶ 45, 47-49, 52-53).

The parties' business relationship later gave rise to litigation in several forums. On November 29, 2022, Blue Sky sued Forcome Shanghai in Ohio's Cuyahoga County Court of Common Pleas, asserting, among other things, claims for breach of the Cooperation Agreement, tortious interference, and trade secret misappropriation. (D.I. 270 at 4; *see also* D.I. 285 at 19, Ex. 26). On February 2, 2023, Blue Sky commenced this action against Forcome Hong Kong and AOB, initially asserting design patent infringement. (D.I. 1). The following month, Blue Sky filed a separate patent infringement action against Forcome Hong Kong and TSM in the Western District of New York. (D.I. 244 ¶ 55). Blue Sky ultimately dismissed its lawsuits in the Cuyahoga County Court of Common Pleas and the Western District of New York. (D.I. 285 at 19).

On April 21, 2023, Blue Sky filed a First Amended Complaint in this action, adding claims for breach of contract, tortious interference, and trade secret misappropriation and naming TSM as an additional defendant. (D.I. 16). Forcome Shanghai thereafter intervened, and on February 13, 2024, Blue Sky filed the operative Second Amended Complaint, which omitted its original claim for patent infringement and left only Forcome Shanghai and Forcome Hong Kong as Defendants. (D.I. 25, 94, 95). Both Defendants answered with tortious interference

counterclaims, and Forcome Shanghai separately alleged breach of contract relating to the Cooperation Agreement. (D.I. 101, 102).

From August 11 to August 15, 2025, the Court presided over a five-day jury trial on the parties' remaining claims and counterclaims. (*See generally* Tr.). On August 18, 2025, the jury returned its verdict finding that Forcome Shanghai breached the Confidentiality Provision of its Cooperation Agreement with Blue Sky, that both Forcome Shanghai and Forcome Hong Kong tortiously interfered with Blue Sky's business relationships, and that both Defendants misappropriated Blue Sky's trade secrets. (D.I. 254 at 2-3). The jury determined that Forcome Shanghai and Forcome Hong Kong acted maliciously in connection with their tortious interference and that they acted willfully or maliciously in connection with their misappropriation of Blue Sky's trade secrets. (*Id.* at 4). The jury also found against Plaintiff, determining that Blue Sky breached the Exclusivity Provision of its Cooperation Agreement with Forcome Shanghai and that it tortiously interfered with both Defendants' business relationships. (*Id.* at 5-6). The jury further found that Blue Sky acted maliciously in connection with its tortious interference. (*Id.* at 7).

Based on these findings, the jury awarded damages to each party. On Blue Sky's claims against Forcome Shanghai, the jury awarded $989,534 in compensatory damages and $906,933 in punitive damages. (D.I. 254 at 3-4). On Blue Sky's claims against Forcome Hong Kong, the jury awarded $824,331 in compensatory damages and $906,933 in punitive damages.[2] (*Id.*). On Forcome Shanghai's counterclaims, the jury awarded $8,337 in compensatory damages and $10 in punitive damages, and on Forcome Hong Kong's counterclaims, the jury awarded $8,337 in

[2] Specifically, the jury assessed compensatory damages against Forcome Shanghai in the amount of $165,203 for breach of contract, $659,128 for tortious interference, and $165,203 for trade secrets misappropriation. (D.I. 254 at 1-3). It assessed compensatory damages against Forcome Hong Kong in the amount of $659,128 for tortious interference and $165,203 for trade secrets misappropriation. (*Id.*).

compensatory damages and $10 in punitive damages. (*Id.* at 6, 8). The Court entered judgment in accordance with the jury's verdict on August 21, 2025. (D.I. 263).

The parties have filed numerous post-trial motions. Blue Sky moves for judgment as a matter of law on Defendants' tortious interference counterclaims. (D.I. 281). Blue Sky also moves to amend the judgment to award exemplary damages, an additional year of disgorged profits, and pre- and post-judgment interest. (D.I. 280). In connection with its request for additional profits, Blue Sky seeks supplemental profit data and leave to supplement its damages based on that production. (D.I. 282 at 18-19). Finally, Blue Sky seeks a permanent injunction prohibiting Defendants from making or selling products derived from its trade secrets. (D.I. 280).

Defendants move for judgment as a matter of law on Blue Sky's tortious interference claim, its trade secrets misappropriation claim, and the punitive damages awards. (D.I. 268). In the event the Court denies their motion for judgment as a matter of law as to Blue Sky's tortious interference claim, Defendants ask the Court to alter or amend the judgments on that claim by reducing the damages awards. (*Id.*). Forcome Shanghai additionally moves for judgment as a matter of law both on Blue Sky's breach of contract claim and on its breach of contract counterclaim. (D.I. 268, 269). In the event the Court denies judgment as a matter of law on Forcome Shanghai's breach of contract counterclaim, it seeks a new trial on that claim. (D.I. 269). Briefing on these motions was completed on October 30, 2025. (D.I. 289, 291). On September 18, 2026, the Court sought letters from the parties on issues raised in the post-trial motions. (D.I. 300). Those letters were filed on September 23, 2026. (D.I. 301, 302).

## II. LEGAL STANDARDS

### A. Judgment as a Matter of Law

Judgment as a matter of law may be entered against a non-moving party if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on

[an] issue." Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). "Judgment as a matter of law is proper only if the record is critically deficient of the minimum quantum of evidence needed to support the verdict." *Washington v. Gilmore*, 124 F. 4th 178, 185 (3d Cir. 2024) (internal quotation marks omitted). It is a remedy to be invoked "sparingly." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004); *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

In assessing a renewed motion for judgment as a matter of law under Rule 50(b), the Court "may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube*, 4 F.3d at 1166 (citation omitted). Moreover, in the Third Circuit, when the movant bears the burden of proof on an issue, judgment as a matter of law is appropriate only if "there is insufficient evidence for permitting any different finding." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976) (citations omitted).

### B. <u>Motion for a New Trial</u>

"[A]fter a jury trial," the Court may grant a new trial "to any party" on "all or some of the issues" for "any reason for which a new trial has heretofore been granted" in federal court actions at law. Fed. R. Civ. P. 59(a)(1)(A). Common grounds for a new trial are: "(1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced

the verdict; or (4) where the jury's verdict was facially inconsistent." *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

Whether to grant a new trial is a question committed to the Court's discretion. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Unlike the standard for judgment as a matter of law, on a motion for a new trial, "the Court need not view the evidence in the light most favorable to the verdict winner." *Ateliers*, 85 F. Supp. 3d at 776. "Nevertheless, new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

### C. Motion to Alter or Amend a Judgment

"Rule 59(e) allows a litigant to file a motion to alter or amend a judgment." *Banister v. Davis*, 590 U.S. 504, 507 (2020) (internal quotation marks omitted). "[T]he Rule was adopted to make clear that the district court possesses the power to rectify [any issues] in the period immediately following the entry of judgment." *White v. New Hampshire Dept. of Emp't Sec.*, 455 U.S. 445, 450 (1982) (cleaned up). "A proper Rule 59(e) motion must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 729 (3d Cir. 2020) (cleaned up).

## III. DISCUSSION

### A. Defendants' Renewed Motion for Judgment as a Matter of Law or to Alter the Judgment

Defendants' challenges to the trade secret and tortious interference verdicts against them require the Court to distinguish among the conduct of Forcome Shanghai, Forcome Hong Kong,

and nonparty Forcome Qingdao. Defendants argue that they cannot be held liable for conduct by nonparty Forcome Qingdao and that the evidence does not establish each Defendant's involvement in the alleged acts. (D.I. 270 at 5-6, 13). Blue Sky responds that the evidence supports liability based on Defendants' own conduct and, alternatively, that all three Forcome entities operated as a joint venture. (D.I. 285 at 5-9, 13-14). The Court first addresses Blue Sky's joint venture theory and then considers the challenges to the verdicts against each Defendant.

**1. <u>Joint Venture</u>**

Blue Sky argues that the verdicts it obtained may be sustained on the ground that Forcome Shanghai, Forcome Hong Kong, and Forcome Qingdao operated as a joint venture such that the acts of one entity can be attributed to the others. (D.I. 285 at 7-9). In support, Blue Sky points to evidence of common ownership and control among the three entities, their respective roles in manufacturing and selling the grinders at issue, and evidence of transfers of money and information among them. (*Id.* at 8-9). Defendants respond that Blue Sky did not present a joint venture theory at trial and cannot introduce that theory after the jury has returned its verdict. (D.I. 289 at 1). The Court agrees. Blue Sky did not preserve that theory for trial, and, in any event, the evidence at trial would not permit a reasonable jury to find that the entities formed a joint venture.

"[A] pretrial order when entered limits the issues for trial and in substance takes the place of pleadings covered by the pretrial order." *Basista v. Weir*, 340 F.2d 74, 85 (3d Cir. 1965); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007); Fed. R. Civ. P. 16(d), (e). Claims and issues omitted from the final pretrial order are generally waived. *See Rockwell*, 549 U.S. at 474; *see also Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint."). The Court construes the pretrial order liberally to encompass the legal and

factual theories inherent in the issues it identifies. *See United States Gypsum Co. v. Schiavo Bros., Inc.*, 668 F.2d 172, 181 n.12 (3d Cir. 1981) ("[P]retrial orders under Rule 16 are to be liberally construed to embrace all legal and factual theories inherent in the issues defined therein."). Though construed liberally, "a party still must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." *Shell Petroleum v. United States*, 182 F.3d 212, 218 (3d Cir. 1999).

Here, the pretrial order identified whether Forcome Shanghai, Forcome Hong Kong, and Forcome Qingdao were "commonly owned and controlled by David Wang," the President and CEO of all three Forcome entities, and whether they operated as "one coordinated unit" as issues of fact to be tried to the jury. (D.I. 244 ¶¶ 66, 89, 104, 106-107). Those provisions placed the entities' ownership and operational relationships in dispute, but they did not "unequivocally" put at issue whether the entities were engaged in a joint venture. *Shell*, 182 F.3d at 218.

Nor was a joint venture theory tried by consent. *See* Fed. R. Civ. P. 15(b)(2). "[A]n issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried." *See Douglas v. Owens*, 50 F.3d 1226, 1235-36 (3d Cir. 1995). Here, the organizational and financial evidence on which Blue Sky relies to establish a joint venture had other purposes at trial. Blue Sky characterized its questioning about the Forcome Group to the Court as "background," and the testimony concerning intercompany transactions and profits between the Forcome Group entities addressed Defendants' counterclaim damages. (Tr. 348:19-349:3; Tr. 574-79). Introducing that evidence therefore did not notify Defendants that Blue Sky sought to impose liability based on a joint venture. Furthermore, the jury was not instructed on joint venture liability. (Tr. 817-33). Nor did the verdict form ask the jury to determine whether a

joint venture existed. (D.I. 254). As such, the Court concludes that Blue Sky did not preserve the joint venture theory it now seeks to rely on to uphold the jury's verdicts.

But even were the Court to conclude otherwise, that theory fails as a matter of Ohio law.[3] Under Ohio law, a joint venture requires an express or implied agreement to pursue joint profits and share losses. *See Ford v. McCue*, 163 Ohio St. 498, 502-04, 127 N.E.2d 209 (1955). "[T]he profit accruing *must* be joint and not several." *Id.* at 503 (emphasis added). To show joint profits, Blue Sky relies on testimony from Defendants' damages expert, David Haas, that payments for goods entered through Forcome Hong Kong and that internal transfer prices were used to move goods among the Forcome Group entities. (D.I. 285 at 8 (citing Tr. 575:6-11, 578:8-21); *see also* Tr. 563:12-20). That customer payments entered through Forcome Hong Kong, however, merely establishes where the entities' outside revenue originated; it does not establish that the three entities were jointly entitled to the resulting profits. Likewise, Haas described the intercompany payments as transfer prices for goods purchased and sold among the entities, (Tr. 575:6-11, 578:8-21), but Blue Sky identifies no evidence that those prices reflected an agreement to divide joint profits.

Moreover, even if Haas's testimony supported an inference that Forcome Shanghai and Forcome Hong Kong shared joint profits and losses, that would not establish Forcome Qingdao's participation in the arrangement. The evidence that Forcome Qingdao manufactured goods sold to Forcome Shanghai establishes its participation in the production and distribution process, but does not establish an agreement to share joint profits or losses with the other entities. (D.I. 285 at

[3] The parties have, throughout this litigation, treated Ohio law as governing Blue Sky's trade secret and tortious interference claims. (*See* D.I. 160 at 14 n.2 ("[T]he parties have been operating as if Ohio law applies.")). Neither party has argued that a different state's law should apply. As such, the Court applies Ohio substantive law to these claims.

8; Tr. 365:18-366:12). Blue Sky additionally points to Forcome Shanghai's continued operation despite negative profits as evidence of profit sharing among the three entities. (D.I. 285 at 8). The cited testimony, however, concerned a negative lost profit calculation that Haas attributed to timing differences between Forcome Shanghai's acquisition and its resale of goods. (Tr. 578:6-21). It did not establish that the entities shared losses or profits, and Blue Sky identifies no evidence that Forcome Shanghai's continued operation depended on an agreement to do so.

Thus, even assuming Blue Sky preserved its joint venture theory, the Court concludes the evidence would not permit a reasonable jury to find that Forcome Shanghai, Forcome Hong Kong, and Forcome Qingdao formed a joint venture. The Court therefore will not sustain the verdicts on Blue Sky's joint venture theory, and will assess the evidence of each Defendant's conduct separately.

### 2. Trade Secret Misappropriation

Defendants seek judgment as a matter of law on the jury's verdicts finding that they misappropriated Blue Sky's trade secrets under the Defend Trade Secrets Act ("DTSA") and the Ohio Uniform Trade Secrets Act ("OUTSA").[4] (D.I. 270 at 9-13). Defendants argue that the claims based on Forcome Qingdao's Chinese Patents are untimely and that Blue Sky failed to

[4] Plaintiff asserted claims of trade secret misappropriation under both OUTSA and DTSA. Given the overlap between state-adopted versions of the Uniform Trade Secrets Act and DTSA, courts often analyze parallel state and federal claims of trade secret misappropriation together. *See, e.g., Corp. Lodging Consultants, Inc. v. Szafarski*, No. 1:21-CV-1611, 2021 WL 3709914, at *5 (N.D. Ohio Aug. 20, 2021) (explaining that the definition of a trade secret and requirements for establishing misappropriation "are substantially the same" under DTSA and OUTSA). Here, the jury rendered its verdict under common instructions addressing both statutes. (Tr. 829:4-8). Neither party objected to those instructions, and neither argues that applying OUTSA rather than DTSA would lead to a different result on the substantive sufficiency issues raised here. (Tr. 794:1-3; *see also* D.I. 285 at 10 n.1). The Court therefore analyzes Defendants' challenges to the sufficiency of the evidence under DTSA, with its conclusions applying equally to those claims brought under OUTSA.

present sufficient evidence of a protectable trade secret, misappropriation by either Defendant, or resulting damages. (*Id.*).

Blue Sky relies on three alleged acts to sustain the jury's trade secret misappropriation findings: (i) the disclosure of Blue Sky's design drawings and manufacturing information to Forcome Qingdao for Forcome Qingdao's subsequent incorporation of that information into Chinese Patents; (ii) the use of Blue Sky's methods, techniques, processes, and know-how to manufacture competing grinders for AOB and TSM after the parties' relationship ended; and (iii) the disclosure of Blue Sky's product development history and pricing information to the Retailer in a July 7, 2020 email. (D.I. 285 at 10-11, 14). The Court addresses Defendants' challenges to each asserted basis in turn.

**a. <u>The Chinese Patents</u>**

DTSA requires an action to be brought within three years after the misappropriation was discovered or should have been discovered through reasonable diligence. *See* 18 U.S.C. § 1836(d). OUTSA provides a four-year limitations period measured from that same point. *See* Ohio Rev. Code § 1333.66. Defendants argue that Blue Sky's trade secret claims are untimely insofar as they rest on the alleged disclosure of Blue Sky's design drawings and manufacturing information to Forcome Qingdao for incorporation into the Chinese Patents. (D.I. 270 at 9).[5]

---

[5] Both statutes provide that a continuing misappropriation constitutes a single claim. *See* 18 U.S.C. § 1836(d); Ohio Rev. Code § 1333.66. Defendants' limitations argument in their Rule 50(a) motion and in their post-trial briefing concerns only the Chinese Patents, and they do not challenge Blue Sky's post-trial assertion that its theories concerning the July 7, 2020 email and the manufacture of competing grinders for AOB and TSM are timely. (Tr. 604:6-13, 608:8-9; D.I. 270 at 9; D.I. 289 at 4). As such, the Court considers only the timeliness of Blue Sky's trade secret misappropriation claims to the extent those claims rely on Plaintiff's Chinese Patent theory of misappropriation. *See Lightning Lube*, 4 F.3d at 1173.

The accrual date of Blue Sky's claims concerning the Chinese Patents is undisputed. Blue Sky stipulated that it knew of those patents no later than April 5, 2018. (D.I. 244 ¶ 34). Blue Sky identifies November 29, 2022 – when it commenced the Ohio action against Forcome Shanghai – as the date it first asserted its misappropriation claims. (D.I. 285 at 23). Even using that earliest filing date, more than four years had elapsed from April 5, 2018. Thus, absent the applicability of equitable tolling, Blue Sky's trade secret misappropriation claims under both DTSA and OUTSA are time barred insofar as they rely on the Chinese Patents.

Blue Sky argues that its claims are nonetheless timely because equitable tolling applied during the pendency of certain Chinese proceedings that followed the October 2020 Chinese Customs seizure of a shipment containing Blue Sky-Yuchi Grinders. (D.I. 285 at 23). The parties described those proceedings as concerning Forcome Qingdao's enforcement of its Chinese Patents against Yuchi's manufacture and export of the Blue Sky-Yuchi Grinders. In addition to seeking detention of the shipment through Chinese Customs, Forcome Qingdao brought a patent infringement action against Yuchi in China in December 2020. (Tr. 16:21-18:4, 22:8-13; D.I. 244 ¶ 113). Blue Sky and Yuchi retained Chinese attorneys to contest the seizure, and Chinese Customs released the shipment on December 31, 2020. (Tr. 230:9-23; D.I. 244 ¶ 44). Blue Sky represents that the ensuing patent litigation resulted in invalidation of the asserted patent and that it first asserted its misappropriation claims shortly after the Chinese proceedings concluded. (D.I. 231 at 35:17-25; D.I. 285 at 23). It explains that it believed it first needed to invalidate the Chinese Patents to establish its ownership of the underlying inventions before pursuing its misappropriation claims. (D.I. 285 at 23). Defendants respond that this misunderstanding does not warrant equitable tolling. (D.I. 289 at 4).

Under both federal and Ohio law, equitable tolling requires diligent pursuit of the claimant's rights and an extraordinary circumstance that prevented timely filing. *See Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255-56 (2016); *see also Coleman v. Columbus State Cmty. Coll.*, 49 N.E.3d 832, 838 (Ohio Ct. App. 2015) ("The doctrine of equitable tolling is to be applied sparingly and in only exceptional circumstances."). Even assuming Blue Sky diligently pursued the Chinese proceedings, it has not identified an extraordinary circumstance that prevented it from timely asserting its misappropriation claims. Its belief that invalidating the patents was a prerequisite to suit reflects a misunderstanding of its legal options – constituting "a garden variety claim of excusable neglect" – rather than an extraordinary obstacle beyond its control. *See Menominee*, 577 U.S. at 256-58 (declining to apply equitable tolling where the claimant mistakenly believed that presenting its claims was legally unnecessary or futile); *see also Coleman*, 49 N.E.3d at 839 ("[Plaintiff's] initial misunderstanding, through no fault of [Defendant], of where her claims for money damages against the state could be brought, does not warrant application of the equitable tolling doctrine."). Blue Sky identifies no requirement that it await the outcome of the Chinese proceedings before bringing its misappropriation claims, nor does it represent that Defendants caused its misunderstanding regarding the need to first invalidate the Chinese Patents. The Court therefore declines to toll either DTSA or OUTSA limitations periods and concludes that Blue Sky's theory of liability relating to the Chinese Patents cannot provide a timely basis for the jury's misappropriation verdicts.

**b. <u>The Production of Grinders for AOB and TSM</u>**

Blue Sky also seeks to sustain the trade secret misappropriation verdicts against both Defendants on the theory that its proprietary methods, techniques, processes, and know-how were used to develop and manufacture competing grinders sold to AOB and TSM. (D.I. 285 at 10-13).

Defendants argue that Blue Sky failed to identify the particular trade secrets allegedly used in those grinders. (D.I. 270 at 11-13). Again, the Court agrees with Defendants.

To establish trade secret misappropriation, Blue Sky was required to identify the allegedly misappropriated information with sufficient particularity to distinguish it from matters of general knowledge in the trade and thereby permit an assessment of whether it qualified for trade secret protection. *See Mallet & Co. v. Lacayo*, 16 F.4th 364, 383-84 (3d Cir. 2021) ("It is the trade secret owner that bears the burden of demonstrating its claimed secrets are protectable and are not general industry knowledge."). Although proprietary know-how may remain protected after related information is publicly disclosed, the plaintiff must sufficiently identify what information extends beyond that disclosure. *Id.* at 384. (finding no trade secret due to Plaintiff's "fail[ure] to explain how [the Court] or anyone else is to distinguish between what is generally known or available information and what it contends to be protectable trade secrets"). A combination of public elements may also qualify for protection, but the combination itself must be adequately described. *See Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.,* 53 F.4th 368, 380 (6th Cir. 2022) ("Although a combination-trade-secret plaintiff need not show that any individual item in a combination trade secret is unique, the plaintiff must establish that the combination of known elements or components is unique.").

Here, Jeffrey Palese, Blue Sky's President and Chief Executive Officer, testified that "Forcome" used Blue Sky's information, designs, and improvements to produce the competing grinders, which he viewed to be "very similar" to, and have a "similar shape" as Blue Sky's "Carnivore I and Carnivore II" grinders. (Tr. 245:20-246:5). He stated that Defendants "wouldn't know how to [make such grinders] without [Blue Sky's] knowledge." (Tr. 246:4-5). He did not, however, testify to what, exactly, Blue Sky's knowledge encompassed. Blue Sky's former Chief

Engineer Gregg Kloeppel identified drawings, methods of operation, grease types, and electrical and motor information as categories of information that had been confidential before the Carnivore I Grinder became publicly available in Fall 2015. (Tr. 394:6-21; *see also* D.I. 244 ¶¶ 25, 27). As to information that remained confidential after release of the Carnivore I, he identified pricing information and "[p]robably some internal drive systems that were not obvious to the public." (Tr. 394:1-5). That testimony did not sufficiently describe the particular manufacturing information claimed as secret or explain what aspects of the identified systems and methods remained confidential as of Defendants' development of the AOB and TSM Grinders in 2021.

Nor did Blue Sky distinguish the information underlying this theory from its own public patent disclosures. Blue Sky acknowledged that its own patent covering the grinders at issue was published in 2018, before the AOB and TSM grinders became available in 2021 and 2022. (D.I. 285 at 13; Tr. 420:9-12; 422:10-12). Although manufacturing information extending beyond the patent's disclosures could remain protected, Blue Sky did not sufficiently identify that information or explain how it differed from the information it disclosed in its patents. Because Blue Sky has not identified which specific "drawings[,] manufacturing information . . . [or] proprietary know-how," constitute its trade secrets, the Court – and likewise the jury – cannot "assess[] the alleged trade secret information against other information that the record may reveal is publicly available, easily generated, or widely applicable to or learned in the industry." (D.I. 285 at 12); *Mallet*, 16 F.4th at 385. As a result, Blue Sky's general references to proprietary methods and know-how did not permit a reasonable jury to distinguish the claimed trade secrets from the publicly available information concerning the grinders.

Kloeppel's comparisons of the AOB, TSM, and Blue Sky-Forcome Grinders likewise did not identify the claimed trade secrets with any specificity. He testified that the products contained

matching components and identical injection marks indicating use of the same tooling. (Tr. 418:8-419:1; 421:22-422:9). That testimony did not, however, sufficiently identify the particular manufacturing information claimed as secret, either as embodied in the tooling or otherwise, nor did it distinguish that information from general knowledge in the trade and publicly available information concerning the Carnivore I Grinder. *See Mallet*, 16 F.4th at 383-84. As such, although Kloeppel's comparisons could support a finding that common designs and tooling to those used to produce the Blue Sky-Forcome Grinders were used to produce the AOB and TSM Grinders, they did not identify the trade secret allegedly embodied in that tooling or otherwise used to manufacture the competing grinders. *See Id.* at 383 n.23 ("Circumstances such as access to trade secrets, unusually accelerated or low-cost development of a competing product, and relative lack of prior expertise, may, in combination, establish a likelihood of success on the element of misappropriation. But they do not establish that likelihood for the element on which we focus here: the existence of a trade secret that has been identified with sufficient particularity." (internal quotation marks and citations omitted)).

Viewing the evidence in the light most favorable to Blue Sky, the Court concludes that Blue Sky did not identify the claimed manufacturing information with sufficient particularity to permit a reasonable jury to determine that it qualified for trade secret protection. Accordingly, Blue Sky's AOB and TSM theory cannot sustain the misappropriation findings against either Defendant.

**c. <u>The July 7, 2020 Email</u>**

Blue Sky next argues that the evidence introduced regarding the July 7, 2020 email to the Retailer, which attached a product development history document and a price list, was sufficient to support the jury's finding that Defendants misappropriated its trade secrets. (JTX-43; PTX-48; PTX-49; Tr. 222:2–225:14). Specifically, Blue Sky contends that the email disclosed confidential

development information and the prices Blue Sky negotiated for its purchase of Blue Sky-Forcome Grinders from Forcome Shanghai. (D.I. 285 at 10-12). Defendants argue that the email disclosed no protectable trade secrets, that the Retailer was entitled to receive the information, and that Blue Sky failed to prove resulting damages. (D.I. 270 at 10-11).

As an initial matter, Blue Sky identifies Lee of Forcome Shanghai as the person who disclosed the documents. (D.I. 285 at 14). Its arguments concerning Forcome Hong Kong in relation to the July 7, 2020 email address only Forcome Hong Kong's possession of the pricing information through its role in the parties' financial transactions. (*Id.* at 13-14). That possession does not, without more, establish participation in Forcome Shaghai's disclosure, and Blue Sky identifies no evidence that Forcome Hong Kong directed or participated in sending the documents to the Retailer. Nor, for the reasons already discussed in Section III.A.1, may Blue Sky attribute Forcome Shanghai's disclosure to Forcome Hong Kong through its asserted joint venture theory. The Court therefore concludes that no reasonable juror could find trade secret misappropriation by Forcome Hong Kong based on the July 7, 2020 email. The Court's remaining analysis is therefore limited to Forcome Shanghai.

DTSA and OUTSA protect information that derives independent economic value, actual or potential, from not being generally known or readily ascertainable through proper means, provided that its owner took reasonable measures to maintain its secrecy. 18 U.S.C. § 1839(3); Ohio Rev. Code § 1333.61(D). A contractual confidentiality obligation such as that in the Confidentiality Provision of the Cooperation Agreement does not itself establish trade secret status. *See Mallet & Co. v. Lacayo*, 16 F.4th 364, 382 n.21 (3d Cir. 2021) ("Information can be contractually protected from use or disclosure and not be a trade secret."). Blue Sky nevertheless

presented sufficient evidence for a reasonable jury to find that the negotiated purchase prices reflected in the documents Lee sent to the Retailer constituted a trade secret.[6]

First, the evidence supported a finding that the pricing information derived independent economic value from its secrecy. Palese testified that the shared price list disclosed Blue Sky's confidential, negotiated purchase prices for Blue Sky-Forcome Grinders, which the Retailer, to which Blue Sky then re-sold the grinders, had not previously known, and that disclosure could allow the Retailer to erode Blue Sky's margins in future sales price negotiations. (Tr. 163:9-12; 225:16-226:14). The jury could reasonably infer that secrecy of Blue Sky's acquisition pricing preserved its bargaining position when negotiating sales prices with the Retailer, and that the pricing information therefore had independent economic value. *See State ex rel. Luken v. Corp. for Findlay Mkt.*, 135 Ohio St. 3d 416, 421, 988 N.E.2d 546, 551 (2013) (finding that lease terms and rental rates derived independent economic value from their secrecy because disclosure would place the landlord at a competitive disadvantage).

Second, the evidence supported a finding that the negotiated prices were not generally known or readily ascertainable through proper means. That the same figures represented Forcome Shanghai's selling prices does not require a different result. In *SI Handling Systems, Inc. v. Heisley*, the court found that information about alternate suppliers and their prices did not constitute trade secrets because the suppliers had "every incentive, and every right," to disclose the information to customers. 753 F.2d 1244, 1257 (3d Cir. 1985). Here, as will be discussed further in Section III.A.4, Forcome Shanghai's confidentiality obligation restricted its right to disclose Blue Sky's negotiated purchase prices. Both DTSA and OUTSA expressly include breach

6 Because the Court finds sufficient evidence establishes the pricing list contained Blue Sky's trade secrets, it need not determine whether the developmental history document attached to the July 7, 2020 email also contained trade secrets.

of a duty to maintain secrecy within their definitions of improper means. *See* 18 U.S.C. § 1839(6)(A); Ohio Rev. Code § 1333.61(A). Considered together with Palese's testimony concerning the confidentiality of the particular prices disclosed in the document shared by Lee, that restriction permitted the jury to infer that those prices were not generally known or readily ascertainable through proper means. Forcome Shanghai's knowledge of the prices therefore does not itself defeat protection. The Cooperation Agreement's Confidentiality Provision also supports finding Blue Sky took reasonable measures to maintain secrecy. By securing Forcome Shanghai's agreement to restrict disclosure of the negotiated acquisition prices through the Cooperation Agreement, Blue Sky took an affirmative step to protect the particular information at issue. As such, Blue Sky presented sufficient evidence from which a reasonable jury could find the disclosed pricing information constituted a trade secret.

The evidence further supported a finding that Forcome Shanghai misappropriated the protected pricing information. Both statutes encompass disclosure without consent by a person who knew or had reason to know that the information was acquired under circumstances giving rise to a duty to maintain its secrecy. *See* 18 U.S.C. § 1839(5)(B)(ii)(II); Ohio Rev. Code § 1333.61(B)(2)(b). As explained in the Court's analysis of Blue Sky's breach of contract claim, the Cooperation Agreement did not authorize Forcome Shanghai to disclose these prices to the Retailer. Palese likewise testified that Blue Sky had not authorized the disclosure. (Tr. 226:15-17). The jury therefore could reasonably find that the July 7, 2020 disclosure constituted trade secret misappropriation by Forcome Shanghai.

#### d. <u>**Damages Relating to the July 7, 2020 Email**</u>

Defendants argue that Blue Sky failed to establish damages relating to the July 7, 2020 email – the only ground remaining – because it identified no pricing concessions or lost sales resulting from the email, and its expert did not separately quantify damages attributable to the

disclosure. (D.I. 270 at 10-11). Under DTSA, the loss of protected secrecy constitutes cognizable harm even absent proof of lost sales or other realized financial losses. *See Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892, 913-14 (3d Cir. 2021) (distinguishing the existence of harm from the measures used to determine its amount). Nonetheless, DTSA and OUTSA only permit the recovery of compensatory damages for actual loss and unjust enrichment caused by misappropriation or, alternatively, a reasonable royalty for unauthorized disclosure or use of the trade secret. *See* 18 U.S.C. § 1836(b)(3)(B); Ohio Rev. Code § 1333.63(A). Nominal damages are also available for violation of either DTSA or OUTSA. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 290 (2021) ("When a right is violated, that violation 'imports damage in the nature of it' and 'the party injured is entitled to a verdict for nominal damages.'" (citations and quotations omitted)); *ActionLink, LLC v. Sorgenfrei*, 2010 WL 395243 at *7 (N.D. Ohio Jan. 27, 2010) ("[N]ominal damages are available for trade secret misappropriations."). The jury was expressly instructed that it could find liability and award nominal damages if the evidence did not establish substantial damages. (Tr. 836:3-11).

Here, as already discussed, the evidence permitted a reasonable jury to find that Forcome Shanghai disclosed Blue Sky's protected pricing information without authorization. The evidence did not, however, supply a sufficient basis for measuring damages attributable to that disclosure. Palese testified that disclosure could allow the Retailer to erode Blue Sky's margins, and Kloeppel described the disclosure as detrimental to Blue Sky's relationship with the Retailer. (Tr. 226:2-14; 716:13-717:1). Blue Sky's damages expert acknowledged that he had not separately assessed damages resulting from disclosure of the pricing information. (Tr. 542:15-24). Although the absence of a separate expert calculation is not itself dispositive, Blue Sky identifies no other evidence providing a nonspeculative basis for measuring a resulting loss, a benefit to Forcome

Shanghai attributable to the disclosure, or a reasonable royalty for that disclosure. (D.I. 285 at 17 (identifying only relationship damage and the "opportunity to obtain pricing concessions" as the resultant "damage done by [the July 7, 2020] email")).

Accordingly, although the Court has determined the record contains sufficient evidence from which a reasonable juror could find Forcome Shanghai misappropriated trade secrets in the July 7, 2020 email, that evidence supports, at most, nominal damages on Plaintiff's claims under DTSA and OUTSA.[7]

#### e. <u>Judgments as to Trade Secret Misappropriation</u>

##### i. <u>Judgment as a Matter of Law on Misappropriation</u>

Because the Court determines that none of Blue Sky's asserted theories supplies a legally sufficient basis for finding misappropriation by Forcome Hong Kong, it grants judgment as a matter of law in Forcome Hong Kong's favor on that claim. (*See* D.I. 263 at 2 ¶ 3).

As to Forcome Shanghai and as discussed above, the Court has determined that the July 7, 2020 email is the only asserted basis upon which a reasonable jury could find Forcome Shanghai liable for trade secret misappropriation. The verdict form, however, did not identify which alleged act of misappropriation supported the jury's finding against Forcome Shanghai. The Court therefore cannot determine whether the jury relied on the July 7 disclosure or the legally-

[7] The development history document does not supply an independent basis for compensatory damages. Even assuming that the document contained protected trade secrets and that Forcome Shanghai's disclosure constituted misappropriation, Blue Sky identifies no evidence providing a nonspeculative basis for measuring actual loss, unjust enrichment, or a reasonable royalty attributable to that disclosure. Its discussion of the document cites Palese's testimony describing its confidential contents and the history of the product's development, but that testimony supplies no measure of damages resulting from disclosure. (D.I. 285 at 16-17; Tr. 224:8-12).

barred Chinese Patents theory.[8] Where a general verdict may rest on an impermissible ground, the ordinary remedy is a new trial on the surviving theory – here, on the July 7, 2020 email. *See SEC v. Teo*, 746 F.3d 90, 99 (3d Cir. 2014) (noting that "since the jury used a general verdict form in this case, the Appellants would receive a new trial if they were correct" about one of the grounds for liability being legally unsound). Defendants, however, did not move for a new trial on trade secret liability. (*See* D.I. 268; D.I. 270 at 18-19).

Rule 50(b) does not permit the Court to treat an unsuccessful motion for judgment as a substitute for a timely motion for a new trial. The Third Circuit has explained that, "if motion for judgment n.o.v. must be denied, the court has no power to order a new trial in favor of the moving party . . . unless a motion for a new trial has been joined in the alternative with the motion for judgment." *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 948 n.11 (3d Cir. 1984) (quoting 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2539, at 608 (1971)). Where, by contrast, the movant is not entitled to judgment as a matter of law, Rule 59 supplies the mechanism and time limits for obtaining a new trial. *See Jackson v. Wilson Trucking Corp.*, 243 F.2d 212, 214-16 (D.C. Cir. 1957) ("[D]iscretion to grant [a new trial], however, comes into being only when the record is such that the entry of judgment n.o.v. would be warranted . . . . An

---

8 The legally-barred claim based on the Chinese Patents is a failure of law, not one of proof. *See Griffin v. United States*, 502 U.S. 46, 59 (1991); *see also United States v. Syme*, 276 F.3d 131, 144-45 (3d Cir. 2002) (explaining that the question under *Griffin* is whether the challenge concerns "the sufficiency of the evidence presented on [the] theory" or instead asserts that "the theory is legally invalid"). Jurors are entrusted to evaluate whether the evidence establishes the facts underlying a legally valid theory; they are not expected to recognize that a theory submitted to them is unavailable as a matter of law. As such, "[i]t is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance . . . that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." *Griffin*, 502 U.S. at 59 (quoting *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir. 1991)).

entirely different situation pertains when a verdict could not have been directed."); *see also American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 948 n.11 (3d Cir. 1984). Defendants filed no such motion concerning this claim, and the twenty-eight-day period for ordering a new trial on the Court's own initiative has expired. *See* Fed. R. Civ. P. 59(b), (d). Defendants' reliance on the second sentence of Rule 59(d) is also misplaced. (D.I. 302 at 3); *see also id.* ("After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion."). Forcome Shanghai's timely request for a new trial concerned only damages on its counterclaim for breach of the Exclusivity Provision of the Cooperation Agreement. (D.I. 270 at 15-19). It did not seek a new trial on Blue Sky's trade secret claim. Rule 59(d) permits the Court, after notice and an opportunity to be heard, to grant a timely new trial motion for a reason not stated in that motion, even after the deadline for court initiated relief has expired. *See Kelly v. Moore*, 376 F.3d 481, 484 (5th Cir. 2004). That authority, however, does not permit a timely motion to supply a request for relief outside its scope. *See Tarlton v. Exxon*, 688 F.2d 973, 977-79 (5th Cir. 1982) (holding that one defendant's timely new trial motion did not authorize the Court to grant relief under Rule 59(d) for a codefendant that had not timely sought a new trial); *see also Snellman v. Ricoh Co.* 836 F.2d 528, 532-34 (Fed. Cir. 1987) (holding that a timely motion addressing the plaintiff's claims did not preserve a request for a new trial on the defendant's counterclaim). Here, Defendants seek to expand their timely request concerning counterclaim damages to encompass liability on a distinct claim. Such relief is beyond the scope of that which Rule 59(d) allows.[9] The Court therefore denies Defendants' motion insofar as it

[9] Though it may seem so, this determination does not allow a "manifest injustice" to stand. *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d at 729. As the Federal Circuit has explained, in circumstances similar to the one at hand: "[T]he fundamental fact is that Ricoh has never, at any time, presented to the district court the question of whether it was entitled to a new trial on its counterclaim. . . . [A] remand subjecting a party to another trial

seeks judgment as a matter of law on Forcome Shanghai's liability and cannot otherwise grant Defendants a remedy they did not seek.[10] (*See* D.I. 263 at 1 ¶ 5).

ii. Judgment as a Matter of Law on Damages

The Defendants separately move for judgment as a matter of law on damages. Because the Court has granted Forcome Hong Kong judgment as a matter of law as to liability for trade secrets misappropriation, it additionally grants judgment as a matter of law in Forcome Hong Kong's favor as to damages. (*See* D.I. 263 at 2 ¶ 4).

As to Forcome Shanghai, and as explained above, Blue Sky failed to establish compensatory damages arising from the July 7, 2020 email disclosure. Accordingly, the Court grants Forcome Shanghai's motion for judgment as a matter of law on damages of more than a nominal amount of $1. *See Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1298 (Fed. Cir. 2025) (applying Third Circuit law and treating reduction of an unsupported patent damages award to one dollar as judgment as a matter of law on damages rather than remittitur). (*See* D.I. 263 at 1 ¶ 6).

**3. Tortious Interference**

Defendants seek judgment as a matter of law on Blue Sky's tortious interference claims. They principally argue that Forcome Qingdao, a nonparty, undertook the patent enforcement action that serves as the basis of Blue Sky's claims. (D.I. 270 at 5-6). Alternatively, Defendants ask the Court to reduce the jury's damages awards from $659,128 against each Defendant to

at the behest of an adversary who failed to comply with the [Federal Rules of Civil Procedure] may itself be an injustice to the former." *Snellman*, 836 F.2d at 534.

10 This Court is without the power to grant a new trial in circumstances such as these, but the Court of Appeals' authority is distinct. *See* Fed. R. Civ. P. 50(e).

$21,628 against each Defendant, contending that Blue Sky proved only $43,256 in damages. (*Id.* at 18). The Court addresses liability and damages as to each Defendant in turn.

Under Ohio law, tortious interference with a business relationship requires intentional and unjustified interference with another's existing or prospective business relationship that causes resulting harm. *See Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). Whether interference was improper depends on the circumstances, including the nature and motive of the conduct, the interests affected and advanced, the proximity of the conduct to the interference, and the parties' relationship. *See Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 178-79, 707 N.E.2d 853, 860-61 (1999).

Blue Sky's tortious interference claims concern the disruption of its business relationship with Yuchi, whereby Yuchi was to manufacture the Blue Sky-Yuchi Grinders and supply them to the Retailer. (D.I. 285 at 5-7). Walker Wang, Forcome Qingdao's General Manager, testified that, in the second half of 2020, Forcome Qingdao enforced its Chinese patent rights against Yuchi through its attorney, who requested that Chinese Customs detain the Blue Sky-Yuchi Grinders for allegedly infringing the Chinese Patents. (Tr. 385:23-386:25). Chinese Customs subsequently detained a shipment containing Blue Sky-Yuchi Grinders, preventing its export to the Retailer. (D.I. 244 ¶¶ 41-44). As such, Defendants argue that any tortious interference was committed by Forcome Qingdao, whose conduct cannot be attributed to them. Blue Sky contends that both Defendants participated in bringing about and maintaining that interference, relying on their communications before and during the detention. (D.I. 285 at 6-7).

As discussed in Section III.A.1, Forcome Qingdao's conduct cannot be attributed to Defendants merely because of the companies' shared ownership or shared participation in related business activities. Even still, Blue Sky presented evidence from which the jury could have found

that each Defendant participated in the alleged interference. As to Forcome Shanghai, Blue Sky's former Vice President, Eric Wieser, testified that Laura Lee, Forcome Shanghai's Vice President of Sales, threatened that the Chinese Patents could permit Forcome Shanghai to hold products made by other manufacturers at Chinese Customs, and thereby prevent Blue Sky from obtaining them. (Tr. 375:22-376:11). After the customs hold, Lee additionally proposed to the Retailer that "Forcome" would abandon its legal actions in China and refrain from holding additional shipments if the Retailer awarded "Forcome" fifty percent of its food processing business for two to three years. (JTX-52; Tr. 356:13-357:1). That proposal, considered together with her preceding threat and Lee's position as Vice President of Sales at Forcome Shanghai, permitted the jury to infer that Forcome Shanghai participated in the effort to obstruct Blue Sky's supply relationship with Yuchi.

The evidence also permitted a reasonable jury to find that Forcome Hong Kong participated in the interference through David Wang. Defendants' damages expert testified that Forcome Hong Kong sold the grinders to Blue Sky, received its orders and payments, and expected to earn profits from those transactions. (Tr. 574:16-575:11). Wang served as Hong Kong's President or Chief Executive Officer and was its sole officer and director. (Tr. 364:1-14; 365:7-17). The jury saw evidence that in a December 21, 2018 email, Wang demanded that Blue Sky commit to using "Forcome" as its sole manufacturer and threatened litigation against other factories based on the Chinese Patents. (PTX-128). Wang signed the email as President and CEO of "Forcome Co., Ltd.," the name he identified at trial as Forcome Hong Kong's corporate name. (PTX-128; Tr. 364:5-10). Because the email contained a threat relating to assertion of the Chinese Patents and was signed by Wang in his capacity as President and CEO at the Forcome entity bearing the corporate name Wang identified as Forcome Hong Kong's, the jury could reasonably infer that

Wang acted on Forcome Hong Kong's behalf when leveraging the Chinese Patents against Blue Sky.

The record also supported the jury's finding of resulting harm. Blue Sky's Chief Engineer testified that at least four containers of Blue Sky-Yuchi Grinders were blocked from delivery, and Palese testified that Blue Sky was penalized for failing to meet its supply commitments to the Retailer during the 2020 hunting season. (Tr. 718:1-5; 236:3-19). Dennis Medica, Blue Sky's damages expert, separately calculated $43,256 in damages associated with the delayed shipment. (Tr. 532:9-533:2). The evidence thus supported finding both Forcome Shanghai and Forcome Hong Kong ultimately liable for tortious interference.

Defendants nonetheless urge that the jury's verdicts cannot stand because their interference was justified by Blue Sky's breach of the Exclusivity Provision of its Cooperation Agreement with Forcome Shanghai, and further because Forcome Qingdao was entitled to enforce its then-valid patents. (D.I. 289 at 1-2). Defendants are correct that "an individual is privileged to purposely cause another not to continue a business relation by *in good faith* asserting to protect properly a legally protected interest of his own which he believes may otherwise be impaired by the performance of the transaction." *Reali Giampetro & Scott v. Society Nat'l Bank*, 729 N.E.2d 1259, 1266 (Ohio Ct. App. 1999) (internal quotation marks omitted, emphasis added). Assertion of a protected interest must be done in good faith; in this case, the jury was permitted to find that Defendants did not act in good faith when asserting their interests in either the Cooperation Agreement or the Chinese Patents.[11]

[11] Indeed, the jury found, by clear and convincing evidence, that each Defendant acted maliciously in connection with their tortious interference. (D.I. 254 at 4).

Lee threatened to use the Chinese Patents to prevent Blue Sky from obtaining grinders from another manufacturer. (Tr. 375:22-376:11). Although that threat may have been protective of the parties' Cooperation Agreement and of Forcome Qingdao's patent interests, she later proposed abandoning the legal actions and refraining from further shipment holds if "Forcome" received half of the Retailer's entire food processing business for two to three years. (JTX-52). At trial, Lee testified that the food processing category encompassed products beyond meat grinders. (Tr. 357:2-7). The jury could consider that demand for business extending beyond the disputed grinder transactions – and thus beyond what the Cooperation Agreement and Chinese Patents could reasonably protect – in deciding whether Defendants were acting in good faith to protect their asserted contractual and patent interests. Based on that evidence, a reasonable juror could find Defendants did not.

The Court accordingly denies Forcome Shanghai and Forcome Hong Kong judgment as a matter of law on Blue Sky's tortious interference claims.

**a. <u>Defendants' Request to Alter or Amend the Judgment</u>**

Defendants' alternative request to reduce the damages awards likewise fails. Relief under Rule 59(e) requires at least one of the following: "an intervening change in controlling law; the availability of new evidence; or the need to correct clear error of law or prevent manifest injustice." *In re Processed Egg Prods.*, 962 F.3d at 729 (numerals omitted). Defendants' argument rests on the premise that Medica's $43,256 calculation represented the entirety of Blue Sky's damages evidence. The trial record does not support that premise.

Palese testified that Blue Sky paid the Retailer $75,000 every three months as a penalty for missing the 2020 hunting season and that Blue Sky continued making those payments until January 2025. (Tr. 236:3-19). Kloeppel explained that the payments began as agreed advertising expenditures but continued as penalties after the shipments of Blue Sky-Yuchi Grinders were

blocked, from the first quarter of 2021 through the first quarter of 2025. (Tr. 425:5-426:4). Seventeen quarterly payments of $75,000 total $1,275,000. Adding Medica's $43,256 calculation of actual damages produces $1,318,256 – the aggregate of the jury's two $659,128 awards. The jury's awards therefore correspond to amounts supported by testimony in the record.

Defendants emphasize Wieser's admission that statements to Yuchi concerning certain Retailer penalties were fabricated and Kloeppel's agreement with that testimony. (D.I. 289 at 7; Tr. 695:2-697:4; 711:1-713:5). That evidence may have provided a basis to challenge Blue Sky's witnesses, but it did not require the jury to reject the testimony concerning the quarterly advertising penalty payments. Kloeppel maintained that Blue Sky continued paying those fees because of the held shipments through the first quarter of 2025. (Tr. 718:1-19). The jury therefore had an evidentiary basis to credit the testimony concerning the quarterly payments notwithstanding the admitted fabrications concerning the penalties described in the emails to Yuchi. Defendants' impeachment of the witnesses did not, by itself, render their testimony legally insufficient to support the award. *See Bhaya v. Westinghouse Electric Corp.*, 832 F.2d 258, 262 (3d Cir. 1987) ("Evaluation of witness credibility is the exclusive function of the jury."); *see also Whitehead v. Bond*, 680 F.3d 919, 926 (7th Cir. 2012) ("Discrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive do not render witness testimony legally incredible."). Considering that testimony together with the admissions elicited on cross-examination, the Court finds no clear error or manifest injustice warranting a reduction of the awards. The Court therefore denies Defendants' alternative motion to alter or amend the tortious interference awards.

#### 4. <u>Breach of the Cooperation Agreement by Forcome Shanghai</u>

Forcome Shanghai moves for judgment as a matter of law on the jury's verdict that it breached the Confidentiality Provision of its Cooperation Agreement with Blue Sky. (D.I. 268). Blue Sky bases its contract claim on the same conduct underlying its trade secret claim: the

disclosure of information used to obtain the Chinese Patents; the July 7, 2020 email to the Retailer; and the use of protected information to manufacture the AOB and TSM grinders.. (D.I. 285 at 10-12, 17-18). As with Blue Sky's trade secrets claim, Forcome Shanghai argues that any theory of breach relating to the Chinese Patents is time barred, and further contends that the evidence failed to establish the disclosure or use of any information covered by the Confidentiality Provision or resulting damages sufficient to sustain the verdict. (D.I. 270 at 6-13).

Under Ohio law, courts give effect to the language of an unambiguous agreement rather than imposing obligations the parties did not express. *See Shifrin v. Forest City Enters., Inc.*, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501 (1992) ("When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.").[12] Here, the Confidentiality Provision addresses access to "confidential information or proprietary information of or regarding the other party, including, without limitation," information concerning "products, [c]ustomers, marketing data, methods[,] and related items." (DTX-230 § 7). It prohibits "disclos[ure] or use" of confidential information "without the prior written consent of the other party" and limits use of such information to the business relationship contemplated by the Cooperation Agreement. (*Id.*). The Confidentiality Provision also contains express limitations: its restrictions do not apply to information that exists in the public domain, so long as that information's public status is not the result of a violation of the Cooperation Agreement. (*Id.*). The Court considers each asserted basis for breach in turn.

12 The parties agree that Ohio and Delaware law do not conflict as to the elements of breach of contract. (D.I. 231 at 59:17-21). The relevant interpretive principles likewise yield the same result under either state's law. The Court therefore cites Ohio law in addressing the agreement's scope.

**a. <u>The Chinese Patents</u>**

Blue Sky contends that Forcome Shanghai breached the Confidentiality Provision of the Cooperation Agreement by disclosing information to Forcome Qingdao that enabled it to obtain the Chinese Patents. (D.I. 285 at 12; Tr. 134:22-135:1). Defendants argue that this theory is untimely under applicable Delaware law because Blue Sky knew of the Chinese Patents by 2018 but did not bring its contract claim until 2022. (D.I. 270 at 6-9). Blue Sky responds that Ohio's – not Delaware's – limitations period applies such that its claims are timely, and that, under Ohio law, its claim did not accrue until the October 2020 Chinese Customs seizure of the Blue Sky-Yuchi Grinders caused actual damages. (D.I. 285 at 18-22). The Court agrees with Defendants that this theory is time barred.

Under Delaware's choice-of-law rules, statutes of limitations generally are procedural, and the forum's limitations period applies even when another jurisdiction's substantive law governs the claim. *See Gavin v. Club Holdings, LLC*, No. 15-cv-175-RGA, 2016 WL 1298964, at *3-4 (D. Del. Mar. 31, 2016) ("Delaware law generally determines whether an action is barred by the statute of limitations." (citing *Juran v. Bron*, 2000 WL 1521478 at *11-12 (Del. Ch. Oct. 6, 2000)). Delaware provides a three-year period within which an individual may bring a claim for breach of contract. 10 Del. C. § 8106(a). For claims arising outside of Delaware, the borrowing statute requires application of the shorter of Delaware's limitations period and that of the jurisdiction where the claim arose. *Id.* § 8121. Blue Sky invokes Ohio's six- or eight-year limitations period for its contract claims. (D.I. 285 at 21). Even assuming that the applicable foreign limitations period is the Ohio period Blue Sky identifies, Delaware's borrowing statute nonetheless directs application of Delaware's shorter, three-year period, unless an exception applies.

Blue Sky contends that an exception to the borrowing statute applies here because it did not engage in forum shopping and, in its view, it was effectively forced to litigate here. (D.I. 285

at 19-20). The exception Blue Sky invokes protects a claimant from losing an otherwise timely claim because it was compelled to litigate in Delaware rather than its chosen forum. *See CHC Investments, LLC v. FirstSun Capital Bancorp*, No. 2018-0353-KSJM, 2020 WL 1480857, at *7-8 (Del. Ch. Mar. 23, 2020), *aff'd*, 241 A.3d 221 (Del. 2020) ("[T]he plain language of the borrowing statute governs unless the party asserting the underlying claim was forced into a Delaware forum."). As such, a claimant that voluntarily selects Delaware remains subject to the borrowing statute even if it sought no limitations advantage. *See TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 327 & n.3 (D. Del. July 3, 2014) (applying Delaware's borrowing statute to claims even where there was no evidence of forum shopping). The question therefore is whether Blue Sky was compelled to pursue its contract claims here.

The circumstances here counsel against finding Blue Sky was compelled to litigate in Delaware. Blue Sky initially filed its contract claims in Ohio state court. (D.I. 270 at 4; *see also* D.I. 285 at 19; D.I. 288, Ex. 26 at 1). After commencing this action, it agreed to dismiss the Ohio action and assert those claims here after Defendants proposed consolidating the litigation and stated they would otherwise seek removal and transfer. (D.I. 285 at 19). By Blue Sky's own account, it accepted that proposal "for the sake of efficiency and judicial expediency." (*Id.*). That strategic litigation choice, however, did not make its filing in Delaware involuntary. Nor did the agreement to dismiss and refile effect a transfer under 28 U.S.C. § 1404(a). The rule preserving the transferor forum's law following such a transfer therefore does not apply. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("A change of venue *under § 1404 (a)* generally should be, with respect to state law, but a change of courtrooms." (emphasis added)). As such, the Court finds Delaware's three-year limitations period governs Plaintiff's breach of contract claims.

Under Delaware law, the limitations period begins when the contract is breached, subject to applicable tolling doctrines. *See Weyerhaeuser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445, 451 (D. Del. July 30, 2014). Even assuming that the limitations period was tolled until April 5, 2018 – the latest date by which Blue Sky undisputedly knew of the Chinese Patents – the three-year limitations period expired in April 2021. (D.I. 244 ¶ 34). Blue Sky did not file its Ohio action until November 29, 2022, making this theory untimely even granting Blue Sky the benefit of that earlier filing date. (D.I. 288, Ex. 26 at 1).

Blue Sky's contention that it did not suffer actual damages until the October 2020 customs seizure does not change that result. (D.I. 285 at 21). The alleged contractual breach was the unauthorized disclosure that enabled the Chinese Patents, and Blue Sky knew of that alleged breach by April 5, 2018. The later consequences Blue Sky attributes to the patents did not postpone accrual of its claim based on the disclosure breach relating to them under Delaware law. *See Weyerhaeuser*, 61 F. Supp. 3d at 451. The Court therefore finds that the Chinese Patents theory cannot support the verdict on Blue Sky's breach of confidentiality claim.

**b. <u>The July 7, 2020 Email</u>**

As with its trade secrets misappropriations claim, Blue Sky relies on the July 7, 2020 email to establish Forcome Shanghai's liability for breach of the Confidentiality Provision of the Cooperation Agreement. As discussed in Section III.A.2.c, the price list attached to the July 7, 2020 email contained confidential financial information relating to both Blue Sky and Forcome Shanghai. The Court finds that those confidential financial terms fall within the Confidentiality Provision's protection of "confidential information . . . of or regarding the other party, including, . . . [information concerning] products." (DTX-230 § 7). Specifically, the price list disclosed the negotiated prices Blue Sky paid to acquire Blue Sky-Forcome Grinders from Forcome Shanghai. That the same figures also represented Forcome Shanghai's selling prices

does not remove them from the provision's protection. The Confidentiality Provision does not provide that confidential information is limited to information that concerns one party exclusively; the provision covers any "confidential information or proprietary information of or regarding the other party." (*Id.*).

Defendants' contention that the Retailer was entitled to receive the information does not alter the Court's analysis. (D.I. 270 at 11). Although the Confidentiality Provision contemplates that the Retailer "*may have access to* confidential information," it does not authorize unrestricted disclosure of confidential information among the companies. (DTX-230 § 7). It expressly requires the other party's "prior written consent" to disclosure. (*Id.*). Palese's testimony permitted the jury to find that Blue Sky had given no such consent to Forcome Shanghai regarding the price list attached to the July 7, 2020 email. (Tr. 226:15-17). Because disclosure of the price list was sufficient to support a finding that Forcome Shanghai breached the Confidentiality Provision by sending the July 7, 2020 email, the Court need not decide whether disclosure of the accompanying development history independently did so.

Forcome Shanghai separately challenges the sufficiency of Blue Sky's evidence of damages caused by the July 7, 2020 email. (D.I. 270 at 10-11). Blue Sky relies on the same evidence of harm arising from that email to support both its contract and trade secret claims, identifies no additional evidence providing a nonspeculative basis for measuring loss attributable to the breach. (D.I. 285 at 16-17). Accordingly, for the reasons set forth in Section III.A.2.d, the Court finds that the evidence was insufficient to permit a reasonable jury to award more than nominal damages for the breach arising from the July 7, 2020 email.

**c. <u>The Production of Grinders for AOB and TSM</u>**

Blue Sky also contends that Forcome Shanghai breached the Confidentiality Provision by using confidential information to manufacture grinders for AOB and TSM beginning in 2021.

(D.I. 285 at 18). Forcome Shanghai argues that Blue Sky failed to establish that any information protected by that provision was used to manufacture the AOB or TSM Grinders. (D.I. 270 at 11-13).

The Confidentiality Provision prohibits both unauthorized use and unauthorized disclosure of protected information. Its restrictions, however, do not apply to information "in the public domain not as a result of [the] violation of three parties' undertakings herein."[13] (DTX-230 § 7). Although information need not qualify as a trade secret to receive contractual protection, Blue Sky still had to present evidence permitting a reasonable jury to identify information protected by the Confidentiality Provision that Forcome Shanghai used to manufacture the competing grinders.

As discussed in Section III.A.2.b, Blue Sky did not sufficiently distinguish the manufacturing information allegedly used in the AOB and TSM Grinders from information disclosed in its own patents. Blue Sky responds that its '080 patent was not published until 2018, after the first Chinese patent filing in 2015. (D.I. 285 at 13). That chronology addresses whether the information was covered by the Confidentiality Provision when initially disclosed in connection with the Chinese Patents. It does not establish what information remained confidential when Forcome Shanghai allegedly used it to manufacture the AOB and TSM Grinders beginning in 2021. Nor does Blue Sky contend that its own patent publication violated the Cooperation Agreement such that the information it published remained protected under the Confidentiality Provision's qualification of the public domain exception. (*Id.* at 12-13).

To support its assertion that its proprietary know-how remained confidential before Defendants manufactured the competing grinders, Blue Sky cites Palese's testimony at Tr. 245:15-

---

[13] For purposes of this analysis, the Court assumes that the provision's exception for information falling within Exhibit A does not exclude otherwise confidential manufacturing information concerning the listed grinders.

246:5 and Kloeppel's testimony at Tr. 393:24-394:5. (D.I. 285 at 13). There, Palese testified that Defendants used Blue Sky's information, designs, and improvements and could not have made the competing grinders without Blue Sky's insider knowledge. (Tr. 245:20-246:5). Even crediting that testimony, it did not identify what information remained confidential when Defendants used it.

Kloeppel's testimony likewise did not supply that identification. Asked what aspects of the Carnivore I Grinder he considered confidential when he joined Blue Sky in 2017, he explained that the grinder was, by that time, a released product, and identified only pricing information and "[p]robably some internal drive systems that were not obvious to the public" as confidential as of 2017. (Tr. 393:24-394:5). His more detailed testimony concerning confidential drawings, methods of operation, grease, and electrical and motor information expressly addressed confidentiality before the Carnivore I Grinder became publicly available. (Tr. 394:6-18).

Kloeppel's testimony concerning matching components and identical injection marks between the AOB and TSM Grinders and the Blue Sky-Forcome Grinders permitted an inference that Forcome Shanghai reused designs and tooling employed in manufacturing the Blue Sky-Forcome Grinders. (Tr. 418:8-419:1; 421:22-422:9). That inference does not, by itself, establish a breach of the Confidentiality Provision, which restricts use of confidential or proprietary information rather than use of physical tooling as such. Tooling may embody protected designs, specifications, or methods, but Blue Sky did not point to evidence identifying information embodied in that tooling that remained confidential in 2021 and was used to manufacture the competing grinders. The matching injection marks establish reuse of the tooling, without showing whether any information embodied in it was distinct from what the released grinder and Blue Sky's patents disclosed. Kloeppel's tentative reference to internal drive systems and Palese's general

testimony about Defendants' use of Blue Sky's knowledge did not supply that missing connection. *See Rainworks Ltd. v. Mill-Rose Co.*, 622 F. Supp. 2d 650, 657-58 (N.D. Ohio 2009) (granting summary judgment on a claim for breach of a confidentiality agreement where plaintiffs failed to establish that the defendant used or disclosed confidential information, as opposed to information already known to it or publicly available, including information from the plaintiffs' patent).

Viewing the evidence in the light most favorable to Blue Sky, the Court therefore concludes that it did not provide a sufficient basis for a reasonable jury to find that Forcome Shanghai used information protected by the Confidentiality Provision to manufacture the AOB and TSM Grinders. This theory accordingly cannot sustain the jury's finding of breach of the Confidentiality Provision.

**d. Judgments as to Breach of the Confidentiality Provision**

As with Blue Sky's trade secrets misappropriation claim, the jury's general verdict on liability for breach of the Confidentiality Provision does not permit the Court to assess whether the jury rested its verdict on the July 7, 2020 email, the only remaining permissible theory of breach, or on a legally impermissible theory, such as the time barred Chinese Patents theory. The ordinary remedy for that uncertainty would be a new trial on the surviving theory. *See Teo*, 746 F.3d at 99.

Forcome Shanghai, however, did not timely seek a new trial on Blue Sky's confidentiality claim. Its alternative request for a new trial concerned damages on its own counterclaim for breach of the Exclusivity Provision. (D.I. 269; D.I. 270 at 15-19). For the procedural reasons explained in Section III.A.2.e regarding the trade secrets misappropriation verdict, that request does not authorize a new trial on this distinct claim, and the period for ordering a new trial on the Court's own initiative has expired. *See* Fed. R. Civ. P. 59(b), (d). Because sufficient evidence supports a

finding of breach based on the July 7, 2020 email, the Court denies Forcome Shanghai's motion for judgment as a matter of law for breach of contract. (*See* D.I. 263 at 1 ¶ 1).

The court will, however, grant Forcome Shanghai's motion for judgment as a matter of law on damages relating to the breach of contract. As explained, Blue Sky failed to establish compensatory damages arising from the July 7, 2020 email disclosure. Ohio law, however, permits an award of nominal damages where a plaintiff establishes breach but fails to prove resulting actual damages. *See DeCastro v. Wellston City Sch. Dist. Bd. of Edn.*, 94 Ohio St. 3d 197, 198-99 (2002). Accordingly, the Court grants Forcome Shanghai's motion insofar as it challenges damages against it in excess of a nominal amount of $1. *See Rex Med.*, 156 F.4th at 1298 (applying Third Circuit law and treating reduction of an unsupported patent damages award to one dollar as judgment as a matter of law on damages rather than remittitur). (*See* D.I. 263 at 1 ¶ 2).

**5. <u>Punitive Damages</u>**

Both Defendants further move for judgment as a matter of law on the jury's award of punitive damages against them, arguing the record does not support the jury's finding of malice in relation to their tortious interference or its finding of malice or willfulness in relation to their trade secrets misappropriation. (D.I. 269). Specifically, Defendants argue that the evidence shows "good faith bases for the Forcome entities' actions." (D.I. 270 at 14). According to Defendants, those bases include: Forcome Qingdao's role in developing the Blue Sky-Forcome Grinders and an asserted "gentleman's agreement" permitting it to obtain Chinese Patents; Lee's purported effort to mitigate losses from Blue Sky's canceled orders in her July 7, 2020 email to the Retailer; and Forcome Qingdao's reliance on counsel in enforcing its patents to protect its business interests. (*Id.* at 14-15).

Those explanations were disputed at trial. Palese denied the existence of a "gentleman's agreement" permitting Forcome Qingdao to obtain the Chinese Patents, and Wieser testified that

he knew of no such arrangement. (Tr. 202:18-203:5; 375:9-14). The jury also heard testimony that Lee warned Blue Sky that "Forcome" could use the Chinese Patents to stop shipments from another Chinese manufacturer, and Lee acknowledged that she later offered to end the legal actions and stop holding shipments if "Forcome" received a share of the Retailer's food processing business, a business which she admitted extended beyond the sale of meat grinders. (Tr. 375:22-376:11; 356:19-357:7). Crediting that testimony, a reasonable jury could find by clear and convincing evidence that Defendants' participation in the interference,[14] as discussed in Section III.A.3, reflected malice rather than a good faith effort to protect their rights. Defendants' contrary evidence did not require the jury to accept their explanation. Because their motion asks the Court to resolve that conflict in their favor, the Court denies judgment as a matter of law on the punitive damages finding. *See Bhaya.*, 832 F.2d at 262 ("Evaluation of witness credibility is the exclusive function of the jury.").

### B. Forcome Shanghai's Breach of Exclusivity Counterclaim

On Forcome Shanghai's counterclaim alleging breach of the Exclusivity Provision of the Cooperation Agreement, the jury found Blue Sky liable but awarded Forcome Shanghai no damages. (D.I. 254 at 5). Forcome Shanghai seeks judgment as a matter of law awarding it $2,401,869 in lost profits or, alternatively, a new trial on damages. (D.I. 269; D.I. 270 at 15-17).

#### 1. Judgment as a Matter of Law Awarding $2,401,869

Forcome Shanghai's motion for judgment as a matter of law awarding it $2,401,869, in damages for Blue Sky's breach of the Exclusivity Provision is based on its argument that Forcome

---

[14] The evidence presented on punitive damages award did not distinguish between whether one of the grounds or both justified assessing those damages. And the parties jointly requested a verdict question asking the jury to award a single punitive damages amount if it found liability for either tortious interference or trade secret misappropriation, or both. (D.I. 222, Ex. 1 at 13-14) (Both parties requesting "either or both" formulation).

Hong Kong was an intended third-party beneficiary of the Cooperation Agreement and that Forcome Shanghai was entitled to recover Forcome Hong Kong's projected lost profits resulting from Plaintiff's breach in Forcome Shanghai's name under Federal Rule of Civil Procedure 17(a)(1)(F). (D.I. 270 at 15-17). Under Ohio law, "for an injured third party to qualify as an intended third-party beneficiary under a written contract, the contract *must* indicate an intention to benefit that third party." *Huff v. FirstEnergy Corp.*, 130 Ohio St. 3d 196, 202, 957 N.E.2d 3, *8 (2011) (emphasis added). "[T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [i]s insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Norfolk & Western Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980) (applying Ohio law). The question is whether the Cooperation Agreement was entered into "directly and primarily for [Forcome Hong Kong's] benefit." *Terry v. Hancock-Wood Elec. Coop.*, 2009-Ohio-4925 at *29 (Ohio Ct. App. 2009). The Court determines that it was not.

The Cooperation Agreement identifies Blue Sky and Forcome Shanghai as the contracting parties, defines "FORCOME" as Forcome Shanghai, and grants that entity the exclusive manufacturing role provided by the Exclusivity Provision. (DTX230 at 1). Forcome Shanghai principally relies on a stamp on the Cooperation Agreement, which the Court will, for the sake of argument, grant Forcome Shanghai as stating "[f]or and on behalf of Forcome Co. Ltd." as evidence that the Cooperation Agreement intended to benefit Forcome Hong Kong. (D.I. 270 at 16). The use of the phrase "for and on behalf of," however, merely describes the capacity in which the Cooperation Agreement purportedly was executed; it does not itself specify a benefit that Blue Sky's performance was intended to confer on Forcome Hong Kong. *Terry*, 2009-Ohio-4925 at * 29 ("Although appellants might receive some incidental or indirect benefit from the agreement,

. . . such is not enough to establish a third-party cause of action."). Forcome Shanghai also points to purchase orders and invoices identifying Forcome Hong Kong as evidence that Forcome Hong Kong was an intended beneficiary of the Cooperation Agreement, but Ohio law requires the language of the Cooperation Agreement itself to indicate an intention to benefit Forcome Hong Kong. *See Huff,* 130 Ohio St. 3d at 202 ("*[T]he contract* must indicate an intention to benefit that third party.") (emphasis added). The Court therefore determines the Cooperation Agreement does not establish Forcome Hong Kong's role as an intended third-party beneficiary.

Furthermore, even assuming that Forcome Hong Kong was an intended third-party beneficiary and that Forcome Shanghai could recover damages on its behalf, Forcome Shanghai has not demonstrated entitlement to the requested amount as a matter of law. Haas calculated $2,401,869 in combined lost profits for the Defendants, with a recovery period beginning in August 2020 and ending on August 28, 2024. (Tr. 571:8-13, 572:9-573:2, 579:1-14). The jury was not required to accept that Blue Sky's exclusivity obligation continued throughout that period. Palese testified that the Cooperation Agreement was terminated in July 2020, and Chloe Tu, Forcome Shanghai's Sales Director, understood Blue Sky's July 1, 2020 email as ending the parties' relationship. (Tr. 286:21-25, 378:24-379:7). When asked to assume that the Cooperation Agreement terminated on July 2, 2020, instead of August 28, 2024, Haas conceded that his lost profits figure would be substantially reduced. (Tr. 593:18-594:5). Although he referred to annual figures in his demonstratives, he supplied no revised total reflecting that cutoff. (Tr. 593:6-594:10). The jury's finding of breach therefore did not require it to accept Haas's recovery period or award the entire amount he calculated. Forcome Shanghai's request for judgment as a matter of law awarding $2,401,869 is therefore denied.

### 2. Alternative Request for a New Trial on Damages

Forcome Shanghai alternatively requests a new trial on damages for its breach of exclusivity counterclaim, arguing that the jury's zero-dollar award was against the clear weight of the evidence showing that Forcome Hong Kong was an intended third-party beneficiary of the Cooperation Agreement and suffered lost profits from Blue Sky's breach. (D.I. 270 at 15-17). Although the Court may weigh the evidence when considering this request, a new trial is warranted only where allowing the verdict to stand would result in a miscarriage of justice. *See Williamson*, 926 F.2d at 1353.

The Court finds no such miscarriage of justice here. For the reasons discussed above, Forcome Shanghai has not established that the Cooperation Agreement entitled it to recover Forcome Hong Kong's lost profits. Moreover, even assuming those losses were recoverable, Haas's calculation depended on a disputed damages period. Haas acknowledged that using July 2, 2020 as the termination date would substantially reduce his lost profits calculation, but he did not identify a corresponding amount during that testimony. (Tr. 593:6-594:10). The jury's finding that Blue Sky breached the Exclusivity Provision did not require it to accept Haas's calculation or find that Forcome Shanghai proved compensable loss attributable to that breach. Having considered the evidence, the Court concludes that the zero-dollar award was not against its clear weight and does not warrant a new trial. Accordingly, Forcome Shanghai's alternative request is denied.

## C. Plaintiff's Renewed Motion for Judgment as a Matter of Law

The Court now turns to Plaintiff's post-trial motions, beginning with its motion for judgment as a matter of law on Defendants' tortious interference counterclaims. The Defendants' counterclaims rest on Blue Sky's patent litigation against Forcome Shanghai's and Forcome Hong Kong's customers. After TSM began buying grinders from Defendants in 2022, Blue Sky sued

TSM for patent infringement, and TSM subsequently stopped ordering from Defendants. (Tr. 646:11-647:1, 655:14-23). Defendants alleged that Blue Sky filed those claims to disrupt their customer relationships, while knowing the patent was invalid. (D.I. 286 at 17-18). Blue Sky later dismissed those claims. (D.I. 285 at 19).

The jury found that Blue Sky tortiously interfered with Defendants' business relationships with TSM. (D.I. 254 at 5-8). It awarded each Defendant $8,337 in compensatory damages and $10 in punitive damages. (*Id.*). Blue Sky renews its motion for judgment as a matter of law, arguing that Defendants offered no evidence of intent to interfere with Defendants' business relations or of lack of justification. (D.I. 282 at 19-24). Blue Sky further argues that *Noerr-Pennington* immunity bars the counterclaims, and that no evidence supports the jury's $20 punitive damages award. (*Id.*). The Court considers each issue in turn.

**1. <u>Noerr-Pennington Immunity</u>**

Blue Sky argues that Defendants' tortious interference counterclaims are barred by *Noerr-Pennington* immunity, which presumptively shields the act of petitioning, including the filing of a lawsuit. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349-50 (Fed. Cir. 2014). *Noerr-Pennington* immunity is overcome only by a showing that the litigation was a sham. *Id.* at 1350. Defendants respond that Blue Sky waived the defense by failing to plead it and by failing to raise it in its Rule 50(a) motion. (D.I. 286 at 19-20). The Court agrees that Blue Sky did not preserve this argument and therefore does not reach whether the sham exception applies.

A renewed motion under Rule 50(b) may be granted only on grounds that were raised in a Rule 50(a) motion made before the case was submitted to the jury. *See* Fed. R. Civ. P. 50(b). The earlier motion must be "sufficiently specific to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally

insufficient." *Lightning Lube*, 4 F.3d at 1173. When hearing the parties' Rule 50(a) motions, the Court explicitly invited counsel to state the grounds of the motion with enough specificity that there would be no question later about what had been raised. (Tr. 809:1-3).

Blue Sky's Rule 50(a) motion on Defendants' tortious interference counterclaims did not raise *Noerr-Pennington* immunity or identify the sham litigation exception. (Tr. 812:3-24). Blue Sky argued that Defendants had not "proven any malice, . . . [that] anyone can file a lawsuit for almost anything, . . . [a]nd as a corollary, anyone can dismiss a lawsuit for many different reasons." (Tr. 812:7-11). Blue Sky further urged that the email on which Defendants relied to show malice concerned AOB Grinders rather than TSM Grinders, and that TSM's representative testified he did not need Forcome's products at the time of the alleged interference. (Tr. 812:12-21). Those arguments did not invoke *Noerr-Pennington* or the right to petition, and they did not alert Defendants that they would have to show the patent litigation was a sham.

This omission deprived Defendants of the opportunity to address the defense before the case went to the jury. Defendants represent that, had Blue Sky raised immunity, they would have offered evidence that Blue Sky's patent was invalid and that the suit was brought to harm them through the litigation process itself. (D.I. 286 at 20).[15] Blue Sky's Rule 50(b) motion is therefore denied insofar as it rests on *Noerr-Pennington* immunity.

**2. Intent and Justification**

Blue Sky argues that Defendants presented insufficient evidence that it intended to interfere with Defendants' business relationship with TSM or that it acted without justification. (D.I. 282

---

15 Blue Sky also omitted *Noerr-Pennington* immunity from the pretrial order, which identified its defenses to the tortious interference counterclaims without asserting immunity. (D.I. 244 ¶¶ 276-279). As with Blue Sky's joint venture theory, *see* Section III.A.1, that omission independently supports denial of judgment as a matter of law on the basis of *Noerr-Pennington* immunity.

at 20-23). Viewed in the light most favorable to Defendants, the evidence permitted the jury to find both elements.

On August 4, 2022, Palese forwarded Kloeppel an email showing an AOB meat grinder and in which he wrote, "[t]his is why I have to slow these guys down." (DTX300 at BLUESKY_057453-54). Kloeppel responded, writing that Blue Sky "c[ould] initially go after patent infringement to slow [AOB] Forcome down," but that Forcome "w[ould] be able to invalidate the patent." (DTX300 at BLUESKY_057453; Tr. 283:2-10). Blue Sky then asserted patent infringement claims against TSM, a customer of Defendants', and later dismissed them. (Tr. 283:11-23). This evidence permitted a reasonable jury to find that Blue Sky intended to interfere with Defendants' business relationships with entities like AOB, including TSM.

The same evidence permitted a finding that Blue Sky acted without justification. The jury could find that Blue Sky's motive was to hinder Defendants rather than to vindicate its patent, particularly given its stated expectation that the patent would be invalidated. Blue Sky invokes the presumption that assertion of a granted patent is made in good faith, but that presumption yields to affirmative evidence of bad faith. *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 1000 (Fed. Cir. 2003) (noting that where there is evidence of "incorrectness or falsity, or disregard for either," patent owners are "not protected by the existence of a patent"); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998) ("[A] patentee, *acting in good faith on its belief as to the nature and scope of its rights*, is fully permitted to press those rights." (emphasis added)). The August 2022 email exchange allowed a reasonable jury to find bad faith on the part of Blue Sky, given its explicit acknowledgment that Forcome would be able to invalidate the patent and its stated aim of using patent litigation to slow Forcome down.

The Court therefore denies Plaintiff's motion for judgment as a matter of law on Defendants' tortious interference counterclaims.

#### 3. **Punitive Damages**

Blue Sky finally argues that the evidence does not support the jury's award of $10 in punitive damages to each Defendant. Under Ohio law, punitive damages require actual malice, meaning a state of mind "characterized by hatred, ill will, or a spirit of revenge, or a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Moskovitz v. Mt. Sinai Med. Ctr.*, 635 N.E.2d 331, 343 (Ohio 1994) (cleaned up).

The evidence discussed above permitted the jury to find that Blue Sky deliberately pursued patent litigation to disrupt Defendants' customer relationships despite anticipating invalidation of the asserted patent. (DTX-300 at BLUESKY_057453-54; Tr. 283:2-19). From the expressly stated purpose of that strategy, the jury could infer that Blue Sky understood its actions had a great probability of causing substantial commercial harm. (DTX-300 at BLUESKY_057453-54 (Kloeppel proposing that Blue Sky "initially go after patent infringement to slow [] Forcome down")). TSM's testimony that the lawsuit caused it to stop purchasing Defendants' products corroborated the resulting disruption. (Tr. 654:20-655:1). Viewed in the light most favorable to Defendants, this evidence supported a finding of actual malice by clear and convincing evidence. *See Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St. 3d 36, 44 (1989) (upholding a finding of malice based on advance planning and knowing disregard of contractual business rights under circumstances likely to harm the plaintiff's business). The Court therefore denies judgment as a matter of law on the punitive damages awards.

### D. **Plaintiff's Remaining Motions**

Blue Sky's remaining motions seek a permanent injunction against trade secret misappropriation, additional exemplary damages, pre- and post-judgment interest, and additional

discovery and damages for the period between August 2024 and August 2025. (D.I. 282 at 7-19). The Court addresses each request in turn.

**1. <u>Permanent Injunction Against Misappropriation</u>**

Blue Sky requests a permanent injunction prohibiting Defendants from making and selling products derived, in whole or in part, from its trade secrets, including the AOB and TSM Grinders. (D.I. 282 at 11-15). Blue Sky contends that Defendants' continued manufacture and sale of those grinders will cause further losses of revenue, business opportunities, and market advantages. (*Id.* at 13-14).

The DTSA and the OUTSA each provide that a court "may" enjoin actual or threatened misappropriation. 18 U.S.C. § 1836(b)(3)(A)(i); O.R.C. § 1333.62(A). A party seeking a permanent injunction must demonstrate irreparable injury, the inadequacy of remedies at law, that the balance of hardships warrants equitable relief, and that an injunction would not disserve the public interest. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). As such, the jury's liability finding does not itself establish entitlement to prospective relief. *See id.* at 392-94; *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations."). The party seeking an injunction must show that irreparable injury is likely, not merely possible. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

To meet its burden, Blue Sky principally relies on the jury's verdict and the contention that Defendants continue to sell competing grinders incorporating its trade secrets. (D.I. 282 at 13-14; D.I. 291 at 3-5). As explained in Section III.A.2.b, however, Blue Sky did not sufficiently identify a protected trade secret incorporated into the AOB or TSM Grinders or establish actionable misappropriation through their manufacture and sale. Continued sales of those grinders therefore do not establish continuing misappropriation or an irreparable injury attributable to it.

The July 7, 2020 email likewise does not supply a basis for a permanent injunction. Blue Sky describes that email as disclosing its product and component prices and the Blue Sky-Forcome Grinders' development history to the Retailer. (D.I. 282 at 9 (citing Tr. 222:2-226:17)). Although the email supplied a permissible basis for the jury's liability finding, it was a single disclosure made more than six years ago. (Tr. 606:10-16). Blue Sky identifies no evidence that indicates repetition of such disclosures is likely, and a past disclosure without a cognizable danger of recurrence does not warrant prospective relief. *See W.T. Grant*, 345 U.S. at 633; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983).

Nor does Blue Sky identify any ongoing harm flowing from the July 7, 2020 email. Indeed, Blue Sky's damages expert attributed no damages to the email, and no evidence showed that the Retailer, which was Blue Sky's own customer, changed its purchasing from Blue Sky or turned to Defendants because of it. (D.I. 286 at 8 (citing Tr. 542:15-24, 708:4-24)). Finally, the injunction Blue Sky seeks is directed at making and selling derived products, not at disclosure, and therefore any such injunction would not, in any event, prevent against harm from future disclosures. Blue Sky has therefore shown neither a likelihood of future, nor irreparable, harm from Defendants' misappropriation, and as such its request for a permanent injunction is denied.

**2. <u>Exemplary Damages</u>**

Blue Sky requests an additional exemplary damages award of $991,218 in total, representing three times the $165,203 in misappropriation damages awarded against each Defendant, relying on the jury's findings of malice or willfulness. (D.I. 282 at 7).

The DTSA provides that a court "may" award exemplary damages of up to twice the damages awarded under § 1836(b)(3)(B) for willful and malicious misappropriation. *See* 18 U.S.C. § 1836(b)(3)(C). The OUTSA likewise provides that a court "may" award punitive or exemplary damages of up to three times the award under § 1333.63(A). *See* Ohio Rev. Code

§ 1333.63(B). Neither provision requires an award upon the finding of willful and malicious misappropriation, however. *See AgroFresh Inc. v. Essentiv LLC*, No. 16-662 (MN), 2020 WL 7024867, at *23 (D. Del. Nov. 30, 2020) ("That Defendants' actions are found to be willful and malicious, however, does not necessarily mean that exemplary damages must follow.").

In this case, the jury has already awarded punitive damages. In a single amount, it awarded $906,933 against each Defendant based on its findings on Plaintiff's tortious interference and trade secret claims. (D.I. 254 at 3-4). In the aggregate, that award approximately equals the total compensatory damages awarded across all claims. (D.I. 291 at 3). Defendants contend that an additional award would punish them twice for the same conduct and that the existing award already exceeds the statutory limits applicable to misappropriation damages. (D.I. 286 at 4-6).

Blue Sky's request rests principally on conduct that, for the reasons explained above, cannot support recovery under its misappropriation claims. Its theory of misappropriation based on the Chinese Patents is time barred, and its AOB and TSM theories lack sufficient evidence of any protectable trade secret. *See* Section III.A.2, *supra*. The July 7, 2020 email supplies the only remaining permissible basis for liability, but Blue Sky failed to establish that the disclosure caused compensable loss or unjust enrichment. *See id.* Only nominal damages are supported by the sole remaining theory of trade secret misappropriation liability, and a new trial would ordinarily be required to resolve the uncertainty concerning the basis for the jury's general verdict had that relief been properly sought. Considering the substantial punitive damages already awarded, the deficiencies in the theories that may have supported the verdict, and the limited actionable conduct established by the record, the Court finds no basis to impose further punishment for trade secret misappropriation.

### 3. <u>Additional Discovery and Damages</u>

Blue Sky also requests production of Defendants' profits from sales of the AOB and TSM Grinders between August 2024 and August 2025, along with leave to supplement its damages calculations to reflect those profits. (D.I. 282 at 18-19). According to Blue Sky, the parties' experts received profit data only through August 2024, and Defendants did not provide the additional data requested before trial. (*Id.* at 18). Blue Sky relies on the jury's confidentiality and misappropriation verdicts as establishing entitlement to profits from an additional year of sales. (D.I. 291 at 8). As explained in Sections III.A.2.b and III.A.4.c, Blue Sky failed to establish that sales of the AOB or TSM Grinders resulted from actionable misappropriation or breach of the Confidentiality Provision. Accordingly, the Court will deny its request for additional discovery and disgorgement of profits from those sales.

### 4. <u>Pre- and Post-Judgment Interest</u>

Finally, Blue Sky seeks pre- and post-judgment interest on the jury's trade secrets, tortious interference, and breach of contract awards.

#### a. <u>Prejudgment Interest</u>

Ohio law governs the tortious interference award and permits prejudgment interest only upon findings that Defendants failed to make a good faith effort to settle in the face of Blue Sky's good faith effort to the contrary. Ohio Rev. Code § 1343.03(C)(1). Blue Sky bears the burden of establishing Defendants' lack of good faith in settlement negotiations. *Moskovitz*, 69 Ohio St. 3d at 659. Its opening papers provide calculations but neither address those conditions nor offer evidence establishing them. (D.I. 282 at 16-17).

The trial record instead confirms that the parties' representatives met for approximately an hour to discuss settlement and that Defendants proposed mutual withdrawal of the parties' punitive damages claims. (Tr. 800:22-801:14). Blue Sky identifies no evidence that those efforts lacked

good faith. Its assertion that Defendants had not made a further offer referenced in their opposition does not, standing alone, establish the statutory conditions. (D.I. 286 at 16 n.4; D.I. 291 at 7 n.3).

On this issue, Blue Sky requested a hearing only in reply, and did so without identifying evidence it would present, and without affording Defendants an ordinary opportunity to respond or oppose the request. (D.I. 291 at 7). The Court declines that belated request. *See* D. Del. LR 7.1.3(c)(2). Because Blue Sky has not carried its burden on the present record, prejudgment interest on the tortious interference award is denied.

The same failure of proof defeats interest under Ohio law on the OUTSA awards. As to the DTSA awards, prejudgment interest is discretionary and serves to compensate for the loss of use of money due as damages. *See William A. Graham Co. v. Haughey*, 646 F.3d 138, 145 (3d Cir. 2011) ("[I]nterest may allow an injured party to recoup the time-value of his loss."); *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987). The remaining trade secret award has been reduced to nominal damages because Blue Sky failed to establish recoverable damages on the remaining theory of misappropriation. *See* Section III.A.2.d. Those awards recognize a violation of Blue Sky's rights rather than to compensate for a proven monetary injury. The Court therefore finds prejudgment interest unwarranted as to the DTSA awards.

The Court will, however, award prejudgment interest on the nominal breach of contract award against Forcome Shanghai under Ohio Rev. Code § 1343.03(A), at the applicable statutory rate from April 21, 2023, the alternative start date Blue Sky requests, through August 21, 2025, when judgment was entered. (D.I. 291 at 6). The request for prejudgment interest is otherwise denied.

**b. <u>Post-Judgment Interest</u>**

Post-judgment interest is mandatory for damages awarded in civil cases. *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district

court."). Consistent with § 1961(a), the rate proposed by Blue Sky is the weekly average one-year constant maturity Treasury yield for the week preceding entry of judgment (i.e., 3.91%). (*See* D.I. 282 at 18). Defendants' sole objection is that the damages award should be set aside (D.I. 286 at 16), which is not a basis to deny interest on any part of the judgment that stands. Therefore, Blue Sky shall be awarded post-judgment interest calculated using a rate of 3.91% and starting from the date judgment on the jury verdict was entered (i.e., August 21, 2025). Post-judgment interest shall be awarded for the entire amount included in the judgment. *See Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 217 (3d Cir. 2004). To be clear, however, post-judgment interest on any amount added by an amended judgment does not begin to accrue until the amended judgment quantifying that amount is entered. *See Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 175 (3d Cir. 2010).[16]

## IV. CONCLUSION

For the following reasons, the Court will grant-in-part and deny-in-part Plaintiff's and Defendants' motions. An appropriate order will follow.

16